ROBERT R. POWELL, SBN 159747
**POWELL & ASSOCIATES**
925 West Hedding Street
San Jose, California 95126
Tel: (408) 553-0201
Fax: (408) 553-0203
rpowell@rrpassociates.com

Attorney for Plaintiff A.L.

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.L., a minor by and through her Guardian Ad Litem Korey Santor, | ) ) ) Case No.: |
| | ) **COMPLAINT FOR DAMAGES** |
| PLAINTIFF, | ) ) |
| vs. | ) **DEMAND FOR JURY TRIAL** |
| | ) |
| COUNTY OF STANISLAUS, TONYA LASTER, MARGO KILGORE, JOSEPH GREENE,  JUAN PEREZ, DAVID GRANADOS, JEREMY PANNEL and DOES 1 through 10, inclusive, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## I.   JURISDICTION AND VENUE

1.     PLAINTIFF A.L., a minor by and through her Guardian ad Litem Korey Santor

brings this action pursuant to 42 U.S.C. § 1983, et seq., to redress the deprivation of

rights secured to her under the United States Constitution, including the Fourth and

Fourteenth Amendments. Said deprivations were inflicted by the Defendants herein,

~ 1 ~

and each of them in some manner as alleged in further detail herein. Each of the Defendants herein were at all times acting in concert with the remaining defendants to inflict the harms alleged.

2.    At or near the time of the filing of this Complaint Korey Santor, maternal grandfather to A.L. will move the Court for appointment as A.L.'s Guardian Ad Litem.

3.    Jurisdiction is conferred on this court by 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), which provide for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. § 1983. Jurisdiction is also conferred by 28 U.S.C. § 1331 because the claims for relief derive from the United States Constitution and the laws of the United States.

4.    Because the acts and omissions complained of herein occurred in the County of Stanislaus, and it is believed that all defendants currently reside in the County of Stanislaus, venue is proper in the District Court for the Eastern District of California.

## II.    PARTIES

**PLAINTIFF**

5.    At all times relevant to this Complaint, PLAINTIFF A.L. (23 months old at the time) resided in the County of Stanislaus, California with her mother Leann Santor, and had a brother O.L. until May 9th, 2018 when O.L. passed away as described herein below.

6.    The minor O.L. was born in 2018 and A.L. was born in 2016, and both will be referred to herein by their initials to protect their identity. Leann, her child A.L., and her child O.L. shared all the joys and affection of their parent-child bond, and Leann always ensured that her children were well cared for, fed, housed, and properly clothed.

**OTHER INVOLVED PERSONS**

7.    Other non-party persons relevant to the allegations who may be discussed below include Leann Santor (A.L. and O.L.'s mother), Korey Santor (Leanne's father), Kimberly Santor (Leanne's step-mother), and Douglas Lewis, biological father of O.L. and A.L.

~ 2 ~

8.     Although in a committed co-parenting relationship at the time of the events complained of herein with Douglas, Leanne and Douglas did not reside in the same home. Leanne, A.L. and O.L. were residing at the time of the events complained of, and somewhere between nine to twelve months prior with Korey and Kimberly. Leann and the children would visit Douglas at his residence in a mobile home/camper on occasion, occasionally staying the night, and that was the case on the night of May 8th, 2018 when the most operative events related to PLAINTIFF's claims occurring on May 9th, 2018 began.

9.     O.L. passed somewhere in the late hours of May 8th or earliest hours of May 9th, after which defendants LASTER, KILGORE, GREENE and PEREZ precipitously and without probable or reasonable cause or lawful justification, removed A.L. from her parents.

**COUNTY OF STANISLAUS, SOCIAL WORKER/SUPERVISOR DEFENDANTS**

10.    Defendant COUNTY OF STANISLAUS ("COUNTY") is a municipality in corporate form, organized and existing under the laws of the State of California, and has as an administrative subunit thereof the COMMUNITY SERVICES AGENCY (hereinafter "CSA"), both of which, and any administrative or executive subunits thereof, will be collectively referred to herein as COUNTY.

11.    Defendant TONYA LASTER ("LASTER"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFF'S information and belief, a CSA emergency response Social Worker employed by COUNTY.

12.    Defendant MARGO KILGORE ("KILGORE"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFF'S information and belief, a CSA emergency response Social Worker employed by COUNTY.

13.    Defendant JOSEPH GREENE ("GREENE"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFF'S

~ 3 ~

information and belief, a CSA "Manager III," with supervisory authority over LASTER and KILGORE, employed by COUNTY.

14.    Defendant JUAN PEREZ ("PEREZ"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFF'S information and belief, a CSA "Social Work Supervisor II," with supervisory authority over LASTER and KILGORE.

15.    Defendant DAVID GRANADOS ("GRANADOS"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFFS' information and belief, a CSA Social Worker employed by COUNTY.

16.    Defendant JEREMY PANNELL ("PANNELL"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFF'S information and belief, a CSA "Social Worker Supervisor II" employed by COUNTY, with supervisory authority over GRANADOS.

17.    PLAINTIFF is informed and believes and, based upon such information and belief, alleges that, at all times herein mentioned, each and every defendant-employee of the COUNTY was the agent and/or employee of their co-defendants, and was acting either in their individual capacity or in the scope, purpose and authority of COUNTY, and/or in their employment or agency with said entities, and with the knowledge, permission, ratification, and/or consent of said co-defendants and/or entities.

18.    PLAINTIFF is informed and believes, and thereon alleges, that each of the named individual defendants hereinabove, did knowingly and willingly, with a common intent and scheme set forth in further detail herein below, conspire to plan and execute the unlawful removal of A.L. from her parents' care, custody, and control on May 9th, 2018, in an effort to injure PLAINTIFF and deprive them of their rights, liberties, and interests, as such rights are

~ 4 ~

afforded under the United States Constitution and the California State Constitution, and conspired generally to damage PLAINTIFF and inflict great injury upon them.

**COUNTY OF STANISLAUS – *MONELL* POLICIES & PRACTICES & TRAINING**

19.    CSA may from time to time be referred to as "CPS", which stands for Child Protective Services, and is a common title given to agencies such as CSA. The term "supervisor" and "supervisors" as used herein is a reference to all levels of leadership and management within the CSA unless otherwise specifically stated.

20.    At all times mentioned herein Defendants LASTER, PEREZ, KILGORE, GREENE, GRANADOS, and PANNELL were employees and/or agents of the COUNTY OF STANISLAUS acting within the course and scope of their duties and under color of law at all times relevant herein. They may at times herein, be collectively referred to as the Social Worker Defendants.

21.    COUNTY has in its employment various social workers, such as the aforementioned Social Worker Defendants, who by virtue of their employment are state actors within the meaning of that term in the context of civil rights legislation embodied in 42 U.S.C. 1983.

22.    COUNTY promulgated, encouraged, and/or permitted, the policies, practices and customs described below which were the moving force upon which the individual Defendants, and DOES 1 – 10, committed the acts or omissions complained of herein, and further allege the COUNTY condoned, ratified, and encouraged the conduct of CSA social workers and supervisors, and generally failed to discipline or reprimand not only the Social Worker Defendants herein, but other social workers and supervisors who engaged in identical or similar conduct described below, in the violation of constitutional rights PLAINTIFF complains of in this action.

23.    The events complained of herein arose in the context of a child abuse/neglect referral, which is a frequent and recurring circumstance involving CSA social workers and the Social

~ 5 ~

Worker Defendants, and yet COUNTY also failed to train or inadequately trained CSA employees as described hereinbelow, exhibiting callous and deliberate indifference to causing the recurring violation of parent(s) and children(s) constitutional rights of familial association, just as happened to A.L.

24.    As the employer of social workers and social work supervisors and the Social Worker Defendants herein, COUNTY had primary responsibility for the training, education, and supervision of these employees, as well as the duty to reprimand and/or discipline social workers and supervisors who violated PLAINTIFF's rights and the rights of others similarly situated to PLAINTIFF.

25.    As specified in the Fourth Claim for Relief below, PLAINTIFF contends and alleges the COUNTY is vicariously liable for each of the actions complained of in each of the Claims for Relief below wherein the Social Worker Defendants are alleged to have violated federal laws and/or constitutional rights of PLAINTIFF, such liability inuring to COUNTY by virtue of the law set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny, and by virtue of the fact that the violations complained of herein occurred because of COUNTY policies, practices or customs, and possibly as well the non-existent or inadequate training provided to COUNTY social workers and supervisors and the Social Worker Defendants, such that affirmative actions and/or omissions to take appropriate actions were the moving force behind the violations of the PLAINTIFF'S constitutional rights as alleged in this Complaint.

26.    PLAINTIFF advises, "COUNTY" will not be written into every Claim for Relief below, yet it is PLAINTIFF'S claim that each violation of her constitutional rights contained in Claims For Relief 1 through 3, are violations for which COUNTY is also liable pursuant to the legal doctrine of vicarious liability, which is the basis for the more familiar term *Monell*

Complaint
A.L. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

liability, which has been set forth as if an independent claim, to wit, the Fifth Claim for Relief.

27.     This *Monell* liability for each of the Claims For Relief 1 through 3 should be read and understood to include COUNTY as a Defendant based on the policies and practices described in this Complaint for Damages for those Claims for Relief.

28.     PLAINTIFF alleges that the COUNTY has the following policies, practices, and/or customs which are constitutionally violative of parents and children's rights on their face and yet perpetuated and pursued with deliberate indifference to the rights and safety of PLAINTIFF herein, and families such as PLAINTIFF's family within Stanislaus County, as well as the following non-existent and/or inadequate training;

> **A) [Wallis/Rogers Violations]**  A practice or custom of removing children from their parents or guardians without first performing a reasonable investigation, then still removing children without a warrant, consent, or an imminent risk of serious bodily injury when there is sufficient time to obtain a warrant and there are less intrusive means of protecting the child[ren] from whatever the perceived risk of serious bodily injury to the child[ren] might be; each of these are elements of federal law pertaining to the warrantless removal of children that has been clearly established over two decades with 9th Circuit decisions the likes of *Wallis v. Spencer*, 202 F. 3d 1126 (9th Cir. 1999), and *Rogers v. County of San Joaquin*, 487 F.3d 1288 (9th Cir. 2004).  Such warrantless removals have long been and remain to this day standard operating procedure with CSA social workers and supervisors.  Such warrantless removals are procedural due process violations of the 14th Amendment as to PLAINTIFF and parents.

~ 7 ~

**B)  [Monell Failure to Discipline]** A policy, practice or custom of the COUNTY, including the employees of CSA from emergency response social workers on up to Director Kathryn Harwell, of authorizing and/or ratifying without discipline, threat of discipline or reprimand of any kind, the unlawful constitutionally violative removals of children those social workers and/or their supervisors who have undertaken the removals without warrants wherein the factual circumstances / elements presented in paragraph A above apply and removal was unlawful.

**C)  [Inadequate/Non-Existent Training Relevant Law]**  A policy, practice or custom of the COUNTY wherein social workers and supervisors are either, **1)** not trained at all with regard to federal law and decisional authority as it applies to the removal of children without a warrant, and/or, **2)** trained inadequately in the work of emergency response and/or child welfare generally, constitutional rights of parents and children specifically, and these omissions and/or failures of training have persisted for several years prior to the removal of A.L. despite the obvious fact social workers and their supervisors will in recurring fashion be confronting circumstances requiring such knowledge so as to avoid constitutional familial association rights violations as part of their daily employment obligations with CSA; these omissions and/or failures in training evidencing deliberate indifference of the COUNTY to the rights and liberties of Stanislaus County residents situated as was A.L. on May 9th, 2018 when she was removed from her parents, and/or 3) COUNTY performs no audit of the extent to which training topics or material

~ 8 ~

Complaint
A.L. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

have actually been heard, understood, and absorbed by COUNTY CSA employees.

**D)  [Take-One Take-All]**  A practice or custom of removing any children of a parent or parents who have suffered the loss of another child by death without having done a reasonable investigation before engaging in an act of removing the other child/children, and, doing so regardless of the remaining child/children's status in terms of being in imminent risk of serious bodily, or whether there is sufficient time to obtain a warrant and there are less intrusive means of protecting the child[ren] from whatever the social workers perceived imminent risk of serious bodily injury to the child[ren] might be.

PLAINTIFF submits this practice and custom of sub-paragraph "D," is a CSA "entity cultural analog" to an even more widespread, well-settled standard operating procedure of COUNTY social workers and their supervisors, whereby social workers and their supervisors utilize a "take one – take all" approach when it comes to the removal of children from a family; in other words if there is one child who for some reason is determined to be removed by CSA social workers and supervisors, then the CSA social workers and the supervisors will take that child's siblings, removing them as well, regardless of whether there is reasonable or lawful cause to do so or even any allegation from any source that they are being abused/neglected or at risk of either.

**E.  [Inadequate/Non-Existent Training Re: Damage]**  A policy of the COUNTY wherein social workers and supervisors are, **1)** not trained at all on the

~ 9 ~

severe emotional distress, anxiety and general damage to young children's psyche, as well as the harmful physiological changes to the neurological structures of a young child's brain, including but not limited to decreases in gray and white matter containing nerve cells, synapses, non-neuronal cells, all of which changes which are reasonably likely to negatively affect a young child's emotional, psychological, and physical development for the entirety of the minor child's life and cause, continue, or magnify symptoms and physical manifestations of depression, lethargy, irritability, bonding dysfunction, sleeplessness, headaches, an inability to focus, and negative changes to diet and social skills generally, when they are abruptly removed from their parents, their home, their extended family and/or relatives, or, **2)** are not trained adequately on the aforesaid issues/results of severe and enduring emotional and psychological damage caused by removal of children from their parents.

**F. [Fraud-Misrepresentation-Omission As Practice]**  The COUNTY's CSA has a practice and custom of submitting both sworn and unsworn false statements and false allegations of facts about their investigation of a child abuse/neglect referral and the family members, making misrepresentation of facts and/or circumstances (a.k.a. half-truths, partial-truths), and most commonly as a practice and custom, omitting information and details learned which are exculpatory to the proposition of removing or continuing to detain a minor and/or significantly mitigating or clarifying to a fact related to removal or continued detention of a minor such as PLAINTIFF.

Complaint
A.L. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

29.   The child A.L. was removed from her parents on May 9th, 2018 by virtue of the mutual and conscious agreed upon decision of Defendants LASTER, KILGORE, PEREZ, and GREENE.

30.   As a result of the removal, A.L. and her parents did not live in a manner which remotely resembled an intact family living together and sharing their rights of familial association, circumstances which persisted for at least eighty (80) days.

31.   The singular COUNTY practice alone of removing children without a reasonable investigation, without a warrant, consent, or any type of imminent risk of serious bodily injury, when there are lesser intrusive means and sufficient time to obtain a warrant is causative of A.L.'s removal and the removal of countless other children living in the County of Stanislaus – as noted below.

32.   When that practice is coupled or more accurately "born" of the other policy (training) and practice issues such as the deliberate indifference of non-existent or inadequate training on the governing federal law as arising in matters involving child removals, a practice of taking all children whenever one child in the family passes away or whenever one child in a family is taken, all to which is added non-existent or inadequate training on the severe immediate psychological harm and enduring injury of changes to the neurological structures of children's brains in their development and maturation, there can be no question COUNTY's many faceted "failures" caused, motivated, drove the removal of A.L. on May 9th, 2018.

33.   The aforementioned policy/ies, practices, or customs set forth in paragraphs A – F have also been the moving force behind the removals in the following families known to

~ 11 ~

PLAINTIFF, all within the past four (4) years unless stated otherwise, 1) warrantless removal of children from Angelina Nunes and Emanuel Alves (July 2016) with "take-one take-all," 2) warrantless removal of children from Leah & Serena Ford (September 2017), 3) warrantless removal of children from Jeremy Westfall with "child died, remove other children, 4) warrantless removal of child from Jeremy Westfall and Taylor Webb with "take-one take all," 5) warrantless removal of child from Shane Beard and Hilda Perez with "take-one take-all," 6) warrantless removal of children from Hilda Perez with "take-one take-all," 7) warrantless removal of children from Emannuel and Makeda Wyatt, 8) warrantless removal of a child from McKenzie Olivares with "take-one take-all."

34.    Each and every one of the parents noted in the prior paragraph, when finding themselves in the Stanislaus County Superior Court juvenile dependency court post removal, found themselves reading the reports and W&IC 300 Petitions about their family submitted by social workers and supervisors filled with numerous instances of fraudulent statements, misrepresentations, and omissions of exculpatory, clarifying, or mitigating information known to the removing social worker(s) and/or supervisors.

### III.    COMMON ALLEGATIONS & BACKGROUND

35.    On May 8, 2018, Leann, was spending the evening with her children O.L. and A.L. and their father at his residence in an R.V. trailer owned by Douglas.  Leann had smoked a small amount of medical marijuana earlier that day and Douglas had consumed a small amount of beer.  A small pipe for smoking marijuana, but no marijuana at all, was left on a table outside of the R.V. trailer at the end of the night.  As it became late, Leann chose to remain in the home and she and the children went to sleep on a twin/queen sized bed located in the R.V.

Complaint
A.L. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

36.    Leann woke at one point in the evening and slightly rearranged the location of the kids on the bed, at which time both were sleeping quietly and did not awake from being moved.

37.    At some point in time thereafter, Leann awoke and found O.L. unresponsive with fluid coming out of his mouth.  An ambulance was called immediately, and the child was transported to Emanuel Medical Center.  O.L. arrived at Emanuel at or about 2:00 a.m. on May 9, 2018.  O.L. would be pronounced dead not too long after arrival.

38.    On or about May 9, 2018, at 2:55 a.m. the Emergency Department physician noted in the medical record his diagnostic impression was that O.L. suffered an acute cardiopulmonary arrest.  This impression confirms that O.L. died of natural causes and through no actions of either parent.  This information was made known to LASTER and KILGORE by both the Emergency Physician and the nursing staff at Emanuel Medical Center later that morning.

39.    At about 4:15 a.m. that same morning, Defendants LASTER and KILGORE travelled to the home of the child's father.  LASTER and KILGORE entered the premises without the permission of the father and without a warrant to allow them entrance to the premises. While on the premises they noted numerous empty beer cans and outside they observed what they believed to be some amount of marijuana.

40.    LASTER and KILGORE then traveled to Emanual Medical Center, where they met with representatives of the medical center at approximately 5:26 a.m. They were advised by a Nurse Yadi that upon arrival O.L. was cold, stiff, not breathing, and did not have a heartbeat. They were informed that the minor was blue in the face and his extremities and that he was observed to have blood in his ear.  They were also advised that the treating physician suspected that O.L. died from Sudden Infant Death Syndrome (SIDS).

41.    LASTER and KILGORE thereafter met with the treating physician, Dr. Coon.  Dr. Coon stated that he suspects O.L. died from SIDS.  The doctor reported no bruises or marks were observed on O.L. and that he appeared well cared for, as did A.L.

~ 13 ~

42.    Dr. Coon did not say, nor did anyone say to LASTER and KILGORE that Leann "co-sleeping" with O.L. had caused his death.

43.    At no point did any of the medical professionals or LASTER or KILGORE believe or indicate that either Leann or Douglas were incapacitated in any way.  No one indicated that either was under the influence of marijuana or alcohol.

44.    LASTER and KILGORE then interviewed Douglas and Leann.

45.    At this point Leann and Douglas had been in the hospital for approximately four (4) hours and were dealing with the loss of their son and were visibly emotionally drained and traumatized as any parent would be in the hours after the death of their child.  Nevertheless, Defendants LASTER and KILGORE chose to proceed with their "investigation" and questioning of parents.

46.    Leann informed LASTER and KILGORE that she typically slept with the children near to her to increase bonding. That night she had been feeding O.L. while A.L. was next to her and she fell asleep. Some hours later she awoke and moved O.L. to the foot of the bed and A.L. to the head of the bed.  Leann explained that a short but unknown amount of time later she woke again and found O.L. in the same position at the foot of the bed, but the bed had a wetness under him, his face grey, and blood and fluid leaking out the side of his face.

47.    Leann confirmed that she called 911 immediately, and was told to administer CPR, which Douglas confirmed that he had attempted.

48.     Leann reported no DV, mental health issues, criminal history, or CPS history. She was open about her past issues with alcohol use and current use of medical marijuana.

49.    Leann remained calm, truthful, and cooperative throughout, even providing her telephone number and address to LASTER so that she may be contacted later that day.

50.    The address that Leann provided, was not Douglas' home, rather, it was the home she resided in with her children, the home of Korey and Kimberly.

~ 14 ~

**PRE-REMOVAL MEETING – LASTER, KILGORE, PEREZ, GREENE**

51.    After the interview of Leanna and Douglas at the hospital, LASTER and KILGORE returned to the CSA offices and at about 7:30 a.m. on May 9, 2018 met with PEREZ and GREENE to discuss their response to the circumstances surrounding O.L.'s passing and CSA's next move.

52.    PLAINTIFF is informed and believes that LASTER and KILGORE told PEREZ and GREENE all of the following;

    - Dr. Coon had advised them he suspected O.L. died of SIDS,

    - Dr. Coon had advised them there were no suspicious marks or bruises on either child and both appeared well cared for,

    - Leann had explained to LASTER and KILGORE that she did not "live" with Douglas, but rather lived with her father and his wife Kimberly, and the address she gave when asked for her address was in fact the address of Korey & Kimberly Santor,

    - Leann and Doug were in fact going to the home Leann shared with her father and Kimberly when they left the hospital after speaking with LASTER and KILGORE,

    - There had been no one who reported to them from law enforcement, ambulance personnel, or the hospital doctors and staff, that Leann or Douglas appeared to be under the influence of any narcotics, or were any less than fully cognitive and articulate – despite their profound sadness and fatigue – and LASTER and KILGORE likewise did not see anything indicating either was impaired in any way when LASTER and KILGORE spoke with them at the hospital,

    - The only place a marijuana pipe was found was outside of the Douglas home on top of a table,

    - The RV trailer had running water, it was simply that one had to flip a switch to start the pump for the water,

Complaint
A.L. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

- That although the small refrigerator inside Douglas' home was inoperable, there was a fully functioning refrigerator located outside of Douglas' home,

- All supplies needed to care for an infant and toddler (diapers, pacifiers, baby wipes, clothing, etc) were present in Douglas' home,

- There was nothing in Douglas home that presented an imminent threat of serious bodily injury to anyone in the home.

53.   At the meeting at the CSA offices that morning, despite the foregoing facts and circumstances known to all, LASTER, KILGORE, PEREZ and GREENE collectively decided to remove PLAINTIFF from the care and custody of her parents.

54.   There was no discussion regarding obtaining a warrant to remove the child despite the fact known to all present that there was easy access to a Judge of the Superior Court, and no effort was made by any of the participants to obtain a warrant for the removal of A.L. due to the polices and practices of COUNTY/CSA described hereinabove.

**REMOVAL FROM THE PARENTS**

55.   At approximately 8:45 a.m. that same morning LASTER and KILGROE arrived at the home of A.L.'s maternal grandparents, accompanied by City of Newman police officers.

56.   LASTER then informed the parents mere hours after the tragic loss of their son, that they were there to remove PLAINTIFF; and she did take A.L.

57.   Korey & Kimberly immediately asked why it was that A.L. could not just stay with them, in the home the child considered home and had lived almost the entirety of her life, however, LASTER and KILGORE refused to allow that to occur, taking A.L. to an unknown shelter and/or temporary placement, in either event the child was in a completely foreign location surrounded only by persons she did not know.

58.   Despite having no specific, reasonable or articulable evidence that A.L. was in imminent danger of sustaining serious bodily injury or death within the short amount of time

~ 16 ~

it would have taken to obtain a warrant, and despite obvious lesser intrusive means available such as the child A.L. staying with Korey & Kimberly, regardless of whether Leann stayed in the home or did not, and finally, despite the fact there was far more than sufficient time within which to seek and obtain a protective custody warrant, Defendants LASTER, KILGORE, PEREZ and GREEN precipitously removed A.L. from everyone and everything familiar to PLAINTIFF that morning of May 9th, 2018.

59.    A.L.'s seizure was unreasonable, unlawful, and violated PLAINTIFF's Constitutional rights under the 4th and 14th Amendments to the U.S. Constitution.

60.    At the time of the warrantless removal of A.L. from her custody, Leann, who had just spent long distraught hours in a hospital and was mired in the grief associated with losing one's child, had a strong and painful emotional response to being informed her remaining child, her only daughter was being removed from her. Leann screamed and cursed, cried, and made comments about not wanting to live anymore.

61.    As a result law enforcement present on the scene put Leann under a W&IC 5150 hold and she was taken to a psychiatric facility for an involuntary hold.

62.    The Social Worker Defendants would later use this emotional outburst and expressions of suicidal ideation as a pretext to further detain PLAINTIFF from his parent Leann.

63.    At approximately 9:30 a.m. on May 9, 2018, A.L. was placed in protective custody and delivered to foster care.

64.    Despite the maternal grandfather advising LASTER and KILGORE at the time of A.L.'s removal on May 9, 2018, when they were at his house of his desire to take custody of A.L., LASTER and KILGORE refused to leave A.L. in his care – with or without Leann staying in the home – and a "home assessment" by CSA in consideration of placing A.L. in the home of her own grandfather and grandmother was not carried out until May 15, 2018, one week later.

**GRANADOS, PASILLA, & PANNELL FALSE SWORN COURT FILINGS**

65.   Defendants GRANADOS and PANNEL both whom signed and had filed a W&IC 300 Petition under penalty of perjury seeking to continue the separation of A.L. from both of her parents at the initial Detention Hearing to be held May 14th, 2018.

66.   PLAINTIFF alleges in the alternative, that either Defendants GRANADOS and PANNELL were made fully and well aware of the facts pertaining to the events involving the death of O.L. and the results of CSA's investigation that followed before drafting and submitting the Petition, or made no reasonable effort to investigate or substantiate a single allegation and in doing so either intentionally, or with reckless disregard exhibited deliberate indifference to the truth and to the rights of PLAINTIFF vis-à-vis how the Superior Court judge would rule as to taking temporary court sanctioned removal – retained custody – of A.L. or return her to her parents at the Detention Hearing held May 14th, 2018.

67.   Among the material facts the Petition falsely stated that:

   a.   Leann failed to adequately supervise or protect A.L., resulting in her suffering or potential risk of suffering serious physical harm or illness. This was not true as Leann's parenting never caused A.L. any serious physical harm or illness or caused potential serious physical harm or illness.

   b.   Leann failed to provide adequate food, clothing, shelter, or medical treatment. This was absolutely not true in every particular; A.L. appeared "generally well cared for" as noted by Dr. Coon.

   c.   Leann had mental illness, developmental disability, or substance abuse issues which resulted in a failure to adequately supervise or protect A.L. This was not true first and foremost because A.L. had never been supervised or protected inadequately. Leann's only "mental illness" was the breakdown she had when LASTER and KILGORE removed her child, which was a direct result of the death of O.L. and

~ 18 ~

Complaint
A.L. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

removal of A.L. within hours of each other which resulted in her being placed under involuntary treatment; it was plainly an "acute" event caused by the circumstances of the death of her child being compounded by the precipitous and illegal removal of her remaining child A.L.  Leann had no developmental disability at all, and nothing that in any way compromised her ability to care for her children.  Leann did admit using medical marijuana and a past history of AA meetings, neither of which would constitute probable cause or affected her ability to parent, neither of which had a causal nexus to the death of O.L. much less any harm to A.L. of which there was none.

d.  <u>Leann consistently co-slept with her children including the newborn on a twin-size bed.</u>  This was not true as Leann slept on a much larger bed with ample room for the children, and had a bassinet present in Douglas home.

e.  <u>Leann's newborn O.L. was found unresponsive "as a result of co-sleeping</u> and was later determined O.L. had passed away."  This was not true as the medical professionals found the cause of death to be Congestive Heart Failure, not "as a result of co-sleeping,"

f.  <u>There was a marijuana pipe in easy access of the one-year-old A.L.</u>  This was not true as the marijuana pipe was empty and located outside of the premises up on a table while the child was inside the premises with both her mother and father.

g.  <u>Leann has mental health issues.</u>  This is not true as Leann was emotionally upset by the death of her son and the illegal and unconstitutional removal or her only other child.

h.  <u>The "residence" that Leann and Mr. Lewis shared has health and safety issues.</u>  This was not true as Leann resided with her parents but would visit with the father of her children and was doing so that night.

~ 19 ~

68.    PLAINTIFF alleges the foregoing false facts and omissions of exculpatory or mitigating/ clarifying facts in the Petition caused the juvenile dependency court judge to order the continued removal of A.L. and separation from her parents at the Detention Hearing on May 14th, 2018, particularly given the low standard applied under the law.

69.    Detention hearings are the first hearing in a juvenile dependency matter, and at a Detention hearing the allegations of the Petition are judged on a "prima facie" basis, which is to say the allegations – no matter how outlandish, unsupported by any facts – are deemed to be true.

70.    Defendant Social Workers, and all social workers for CSA that deal in the filing of Petitions are well aware of this very low legal bar for proceeding with a case at the Detention Hearing, and it adds to the problems described in paragraph 26, sub-paragraph F, because they then have an incentive to lie, to misrepresent facts, and to omit significant exculpatory information in Petitions and other documents, which furthers the practice described in the aforementioned paragraph and sub-paragraph.

71.    A.L. remained in foster care for 16 days, before being placed with her maternal grandparents and returned to her home.

72.    The juvenile court dismissed the case on June 28, 2018, returning A.L. to her parents' care under a family maintenance plan agreed to by all parties.

73.    The juvenile dependency case was dismissed on June 28th, 2018.

## DAMAGES

74.    As a result of the conduct of Defendants as stated hereinabove, PLAINTIFF suffered severe emotional distress, anxiety and general damage to her psyche, as well as harmful physiological changes to the neurological structures of her brain, including but not limited to decreases in gray and white matter containing nerve cells, synapses, non-neuronal, all of which changes which are reasonably likely to negatively affect a young child's emotional,

~ 20 ~

psychological, and physical development for the entirety of the minor child's life and cause, continue, or magnify symptoms and physical manifestations of depression, lethargy, irritability, bonding dysfunction, sleeplessness, headaches, an inability to focus, and negative changes to diet and social skills generally.

75.     PLAINTIFF seeks an award of exemplary (punitive) damages under federal law and pursuant to California Civil Code §3294 to make an example of and punish the individual Defendants, and in the hope of deterring future conduct of a similar nature. "Punitive damages" are included in all Claims for Relief, but they cannot lawfully be collected from government entities, and for that reason alone are not requested against COUNTY.

### FIRST CLAIM FOR RELIEF

### 14th Amendment Violation – Initial Removal  – Procedural Due Process

### [A.L. v. LASTER, KILGORE, GREENE & PEREZ]

76.     PLAINTIFF A.L. realleges, and to the extent applicable, incorporates herein as if set forth in full, Paragraphs 1 through 73, as they relate to a claim for relief against LASTER, KILGORE, PEREZ, and GREENE, and DOES 1-10 inclusive, and each of them, for a violation of minor PLAINTIFF's procedural due process rights under the 14th Amendment to be free from unreasonable seizure and/or separation from her parents by an extra-judicial act providing no notice, no opportunity to be heard, and a removal conducted in the absence of a reasonable investigation, without consent or a warrant when there was also a complete absence of any imminent risk of serious bodily injury, there were readily available lesser alternative means to protect the child from even unfounded perceptions of risk of injury and more than sufficient time within which to obtain a warrant.

Complaint
A.L. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

77.   PLAINTIFF re-alleges paragraph 74 as said damages relate to a claim for relief for a violation of the PLAINTIFF'S 14th Amendment procedural due process rights as set forth above.

78.   The punitive damage allegations of 75 apply in this claim for relief to Defendants LASTER, KILGORE, GREENE & PEREZ'S violation of PLAINTIFF'S 14th Amendment procedural due process rights as set forth above.

## SECOND CLAIM FOR RELIEF

### 4th Amendment Violation – Unreasonable Seizure

### [A.L. v. LASTER, KILGORE, GREENE & PEREZ]

**79.**   PLAINTIFF realleges, and to the extent applicable, incorporates herein as if set forth in full, Paragraphs 1 through 73, as they relate to a claim for relief against LASTER, PEREZ, KILGORE, GREENE, and DOES 1-10 inclusive,  and each of them, for a violation of all PLAINTIFF'S 4th Amendment right against unreasonable seizure, with regard to the warrantless removal of PLAINTIFF from the care, custody, and control of her parents on May 9th, 2018.

80.   This Claim for Relief is for the violation of the PLAINTIFF'S 4th Amendment rights under the U.S. Constitution to be free from an unreasonable seizure by government actors.

81.    The PLAINTIFF re-alleges paragraph 74 as said damages relate to a claim for violation of PLAINTIFF'S 4th Amendment rights to be free from unreasonable seizure as set forth above.

82.   The punitive damage allegations of 75 apply in this claim for relief to Defendants LASTER, KILGORE, GREENE & PEREZ'S violation of PLAINTIFF'S 4th Amendment rights as set forth above.

## THIRD CLAIM FOR RELIEF

### 14th Amendment Violation for Judicial Deception

~ 22 ~

## [A.L. v.  GRANADOS & PANNELL]

83.    PLAINTIFF realleges, and to the extent applicable, incorporates herein as if set forth in full, Paragraphs 1 through 73, as they relate to a claim for relief against GRANADOS and PANNEL for judicial deception regarding their filing of a sworn Petition as described hereinabove, which Petition violated PLAINTIFF'S constitutional right to be from the knowing presentation of false or misleading information in juvenile dependency proceedings, and such presentations made with deliberate indifference to or reckless disregard of the truth, inclusive of the actions of omitting facts and information which might reasonably have led the factfinder to a materially different conclusion about the continued custody of the minor; such conduct further violations a minor's procedural and substantive due process rights against continued unreasonable seizure under the 4th Amendment, and continued interference in his/her familial association rights under the 14th Amendment.

84.    The PLAINTIFF re-alleges paragraph 74 as said damages relate to a claim for violation of PLAINTIFF'S 14th Amendment right to be from the knowing presentation of false or misleading information in juvenile dependency proceedings and the continued separation from the PLAINTIFF'S mother Leann Santor in violation of A.L.'s familial association rights, as well as her 4th Amendment rights against unreasonable seizure being continued as a result of false, perjured, or exculpatory/relevant fact omitted material as described and set forth above and in Paragraph 52 & 67.

85.    The punitive damage allegations of 75 apply in this claim for relief to Defendants GRANADOS and PANNEL' in violation of PLAINTIFF'S 4th and 14th Amendment rights as set forth above.

## FOURTH CLAIM FOR RELIEF

Complaint
A.L. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

## *MONELL* RELATED CLAIMS

### [A.L. v. COUNTY OF STANISLAUS]

86.   PLAINTIFF realleges, and to the extent applicable, incorporates herein as if set forth in full, paragraphs 1 through 73, as they relate to a claim of liability against the COUNTY for the removal of A.L. from her parents and home.  Of particular importance to this Claim for Relief are paragraphs 10, and 19 through 34 above.

87.   At all relevant times herein COUNTY, through the approval and ratification of policies that were implemented, and practices and customs that persisted as set forth above, did cause violations of this PLAINTIFF's constitutional rights as set forth above, including rights under the Fourth and Fourteenth Amendments.

**PRAYER FOR RELIEF,**

WHEREFORE, PLAINTIFF respectfully request that this Court:

1)   Award PLAINTIFF general, special and compensatory damages in an amount to be proven at trial;

2)   Award PLAINTIFF punitive damages against the individually named Defendant employees of COUNTY for their extreme and outrageous conduct, in complete disregard for the rights of the PLAINTIFF;

3)   Award PLAINTIFF statutory damages and/or attorney's fees and costs against all Defendants as allowed by 42 U.S.C. §1988;

4)   Grant PLAINTIFF such other and further relief as the Court may deem just and proper;


Date: 11/18/21                                     ___/S/ Robert R. Powell____
                                                   ROBERT R. POWELL, ESQ.
                                                   Attorney for PLAINTIFF

Complaint
A.L. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

**JURY TRIAL DEMANDED**

Date: 11/18/21                                    ___/S/ Robert R. Powell_____
                                                  ROBERT R. POWELL, ESQ.
                                                  Attorney for PLAINTIFF

Complaint
A.L. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.